VETH, *Appellant,* v. GIERTH.

1. **Specific Performance.** A court of equity will not decree the specific performance of a contract if it be not clearly established.

2. ———: WHEN IT WILL NOT BE DECREED. The specific performance of a contract is in equity a matter not of absolute right in the party asking it, but of sound discretion in the court. It will not decree specific performance in cases of fraud, mistake, or of hard and unconscionable bargains, or when the decree would produce injustice, and generally not in any case where such decree would be inequitable under all the circumstances.

3. ———: ———. It requires much less strength of case on the part of a defendant to resist a bill to perform a contract than it does on the part of the plaintiff, to maintain a bill to enforce a specific performance.

*Appeal from Jefferson Circuit Court.*—HON. JOHN L. THOMAS, Judge.

AFFIRMED.

*Dinning & Byrns* and *L. R. Tatum* for appellant.

(1) The contract was taken out of the operation of the statute of frauds by the act of the defendant in paying part of the purchase money. *Galway v. Shields,* 66 Mo. 313, and cas. cit. ; 3 Pom. Eq., sec. 1297, note 2. (2) The defendant's taking possession of the real estate, under and by virtue of his contract with the plaintiff

for the purchase thereof, removed the case from the operation of the statute of frauds. *Young v. Montgomery*, 28 Mo. 604; *Price v. Hunt*, 29 Mo. 171. (3) There is no evidence in this record to support the finding and judgment of the trial court, and this court ought to reverse this judgment and render judgment for the plaintiff for eighteen hundred and fifty dollars, together with interest and costs, and direct that the land in controversy be sold, or enough to satisfy this judgment. (4) The answer of defendant discloses that he has no defence on the merits to plaintiff's cause of action.

*Wislizenus & Kleinschmidt* for respondent.

(1) The evidence, as a matter of fact, justifies the findings of the lower court. (2) Even in equity cases this court defers to the findings of the trial court. *Erskine v. Loewenstein*, 82 Mo. 309; *Sharpe v. McPike*, 62 Mo. 309; *Chapman v. McIlwrath*, 77 Mo. 43; *Chouteau v. Allen*, 70 Mo. 43; *Berry v. Hartzell*, 91 Mo. 132. (3) A court of equity should not decree specific performance of an inequitable contract, or one not clearly established. 2 Story's Equity, sec. 742; *Paris v. Haley*, 61 Mo. 453; *Taylor v. Williams*, 45 Mo. 80; *Fish v. Lightner*, 44 Mo. 268; Bispham's Equity, sec. 371; *Eastman v. Plumer*, 46 N. H. 47; *McDonald v. Lynch*, 59 Mo. 350. (4) The court having possession of the case will give defendant equitable relief. *Paris v. Haley, supra.*

NORTON, C. J.—This suit was brought to enforce the specific performance of an alleged contract for the sale of three hundred and twenty acres of land in Jefferson county to the defendant.

The petition substantially alleges that in July, 1883, plaintiff, by verbal contract, sold to defendant said land at and for the price of twenty-two hundred and fifty dollars, four hundred dollars of which was paid and the

Veth v. Gierth.

remainder to be paid on the second of October, 1883; that the defendant went into possession of the premises under the contract and was still in possession, but refused to pay the deferred payment. It also alleges that plaintiff brings into court his deed conveying said premises to defendant, and asks the court for judgment for said deferred payment, and that it be decreed to be a lien on the land.

Defendant in his answer, after setting up the statute of frauds, states in substance that in July, 1883, he entered into negotiations with plaintiff for the purchase of said land; that plaintiff falsely reported to him that all of said land was tillable except ten acres; that a certain spring was on said land; that a certain orchard was wholly on said land; that a certain road was a public road, and that the land was less than six miles from the town of De Soto in Jefferson county; that twenty-two hundred and fifty dollars was agreed upon as the price of the land; that the only agreement made was that defendant would take the land at that price, provided if, after investigation and informing himself as to these representations, he concluded to do so, and that, after thus informing himself, if he concluded not to take it, plaintiff was to repay the four hundred dollars which defendant let him have about the time or soon after the price was agreed on, and the contract was to end; that defendant had simply an option to take the land at that price, if, after entering on it, he found it to be as represented; that this was the twenty-eighth of July, 1883; that defendant, finding the representations to be untrue, notified plaintiff on the second day of August, 1883, that he would not take the land, and has since that time always been willing to surrender the land in his possession, consisting only of about five acres. The answer prays the court to decree that plaintiff repay the four hundred dollars received by him and that it be declared a charge on the land.

The court found for the defendant; rendered judgment in his favor for four hundred dollars, making it a lien on the land.

Veth, the plaintiff, testified in his own behalf to the following effect: That Gierth, the defendant, came to his, Veth's, house, in St. Louis, wanting to buy a farm, wanting to move out in the country, and Veth went with him to Jefferson county to see the land described in the petition; it was in July. Veth showed him all over the premises; that Veth told Gierth that he did not know exactly where the lines were; that he, Veth, would have the land surveyed; that they went from the land to De Soto, and then back to St. Louis; that Veth told him that if he was going to buy he wanted him to give him an answer pretty soon, as, if he did not sell, he wanted to rent the place out. He, Gierth, said he would decide next day; the next day he came to plaintiff's house; there were present two other persons, Mr. Koeninger and Mrs. Koeninger. I asked him twenty-five hundred dollars for the place; he said it was too much. He offered twenty-two hundred and fifty dollars, and said he would have the surveying done himself next winter if Veth would let him have the part of the crop; he wanted Veth to throw in a gun and then Gierth would have the land surveyed and pay the taxes for 1883, and Veth gave him the gun. Gierth paid four hundred dollars and was to pay the balance on the second day of October, 1883. Mr. Piesch had a deed of trust, and he, Veth, paid him the four hundred dollars that was paid on the farm. Veth took the deed to Gierth's house, and Gierth wanted the deed, but Veth refused to deliver without payment. Gierth went into possession under the contract of purchase, and is still in possession. He further testified that the land was as good farming land as any in Jefferson county; that there are perpetual springs on it; that two years before he had been offered by a peddler, whose name he did not know,.

and who has since died, three thousand dollars for the land.

Mrs. Koeninger, the daughter of plaintiff, testified that she was present at the interview between plaintiff and defendant, and gave substantially the same account of it as that given by her father.

Fink testified that he was a tenant of Veth's for 1883, and moved defendant, at the request of his son, to the place the last of July or first of August of that year, and gave him possession, and that he was still living in the house.

Knopp testified that defendant lived in the house on the forty-acre tract, which is separated from the other two hundred and eighty acres of land; did not know that he occupied anything more than the house; that there are twenty acres of tillable ground on the three hundred and twenty acres.

George and John Piesch testified that about the last of July they held Veth's note for about four hundred dollars, secured by deed of trust on the land in question, and that Veth, in presence of defendant, paid them four hundred dollars in discharge of the note, which amount had been received from defendant by Veth. What was said on that occasion was spoken mostly in the English language, which defendant did not understand; and we attach no importance to their evidence, inasmuch as it only tended to show that they agreed to release and did release the land from the deed of trust on receiving the above payment.

Defendant, who had arrived in this country from Germany, six or eight weeks previous to the time when the alleged contract was made, and who could neither speak nor understand the English language, testified substantially as follows: "Mr. Veth and I went to see the land in July; Veth told me the taxes on the land were twenty-four dollars per year; that there were excellent springs on the lands; that there was a good road; that

it was but six miles to De Soto; he pointed to the fenced land and said it was all his; he told me that but eight acres was rock land; that there was lead ore on the land, containing ninety-five per cent. lead; that I could make a splendid business in lead, and took me to the 'lead mines.' The second day after that trip I had a talk with Veth; we then agreed on twenty-two hundred and fifty dollars as the price, provided everything was all right; Veth told me he needed money or he would not sell; at the time I had not finally examined the property, or this would not have happened. Shortly afterwards I gave Veth four hundred dollars, and told him that it was a loan until August 2; that I wanted to go and see if everything was correct as represented by him. Veth agreed to that; he gave me a written paper, which I supposed to express what we had agreed on. My son told me afterwards what the paper really was.

"I moved on the land August 1, and found out that Veth's representations were false; I wrote to Veth on August 2 and told him I would give him one thousand dollars for the land, and no more; I never touched the two hundred and eighty acres; so far as they are occupied, Jacob Smith is in possession; I have no claim on the land. Shortly after I came to St. Louis and called on Veth, charging him with his misrepresentations; during the interview he made a drawing, representing the springs and other advantages, which drawing I hereby produce. After this interview I wrote a final letter to Veth, breaking off negotiations. I told Veth I would take time to look at the land before I gave him the four hundred dollars; Veth did not explain or translate the receipt; I thought it was a promissory note; I did not consider our negotiations as constituting a binding contract until the papers were exchanged; so I understood the law in Germany; if everything had turned out as Veth represented I would have taken the

Veth v. Gierth.

land, and it would not have been too dear; I did not move from Veth's house, because I have bought a neighboring tract since repudiating this transaction, and am building a house on that which I shall move into."

Dover testified that a large portion of the orchard shown Gierth is not on Veth's land, and that the spring is also over the line.

McCormack valued the whole tract at eight or nine hundred dollars. There is no lead on the land.

Herman Smith is in possession of the cultivated portion of the two hundred and eighty-acre tract, and has never spoken to Gierth.

J. T. McMullen: The good spring is not on the Veth tract. There are some seeps, but no real springs on the two hundred and eighty-acre tract. About forty of the three hundred and twenty acres are tillable. One thousand dollars would be a good price.

Lewis Kleinschmidt: Fifty or sixty acres are tillable; the land is worth eight or nine hundred dollars; there is no perennial spring on the two hundred and eighty-acre tract.

We think it apparent, from all the evidence, that the contract alleged to have been made has not been established by that degree of clearness which would justify its enforcement. While the plaintiff understood it to be an absolute contract of sale for twenty-two hundred and fifty dollars, four hundred dollars of which was to be paid in hand and the remainder on the second of October, 1883, the defendant, on the other hand, understood that he was to take the land at that price, if, on further examination by him, it should turn out to be as represented, and that if, on such examination, he did not find it to be as represented, that the four hundred dollars paid was to be repaid and the trade at an end. From the fact that plaintiff testified that the land was as good farming land as any in Jefferson county, which was contradicted by the evidence of disinter-

ested witnesses, that only from twenty to sixty acres of the whole tract were tillable, and that no one of them valued it at more than one thousand dollars ; and from the fact that he also testified that there were perpetual springs on the land—three in number—in which he was also contradicted, we may well give credence to the evidence of defendant, to the effect that he had the option to decline taking if he found the representations made to him were untrue, which option he promptly exercised in a few days after going on the land and ascertaining that but a small part of it was tillable ; that the spring pointed out as being on the land was not on it ; that part of the orchard was on another's land, and the springs on the two hundred and eighty-acre tract were not perpetual.

A court of equity will not decree specific performance of a contract if not clearly established. *Paris v. Haley*, 61 Mo. 453 ; *Taylor v. Williams*, 45 Mo. 80. The principles announced by sections 769 and 770, 2 Story's Equity, apply peculiarly to this case. It is there said : " It is important to take notice of a distinction between the case of a plaintiff seeking a specific performance in equity, and the case of a defendant resisting such a performance. We have already seen that the specific execution of a contract in equity is a matter, not of absolute right in the party, but of sound discretion in the court. Hence, it requires a much less strength of case on the part of a defendant to resist a bill to perform a contract, than it does on the part of the plaintiff to maintain a bill to enforce a specific performance. When the court simply refuses to enforce specific performances it leaves the party to his remedy at law. An agreement to be entitled to be carried into specific performance ought to be certain, fair and just in all its parts. Courts of equity will not decree specific performance in cases of fraud or mistake, or of hard and unconscionable bargains, or when the decree would produce injustice,

\* \* \* and generally not in any case where such a decree would be inequitable under all the circumstances. \* \* \* But courts of equity do not stop here, for they will let in the defendant to defend himself by evidence to resist a decree when the plaintiff would not always be permitted to establish his case by the like evidence. Thus, for instance, courts of equity will allow the defendant to show that by fraud, accident or mistake, the thing bought is different from what he intended." /

Judgment affirmed, in which all concur.