JAMES H. McQUARY and MISSOURI LAND & DE-VELOPMENT COMPANY v. MISSOURI LAND COMPANY OF SCOTLAND et al., Appellants.

In Banc, July 20, 1910.

1. SPECIFIC PERFORMANCE: Not Absolute Right. The specific enforcement of a contract is not a matter of absolute right, but one of sound discretion in the court of equity, and will be denied in cases where such a decree would, under all the circumstances, be inequitable.

2. ———: Failure to Meet Substantial Terms. Where plaintiff· has wholly failed to meet the substantial terms of the agreement on which he relies for specific performance, he cannot complain if a court of equity leaves him where he has placed himself, and refuses to compel the other party to perform.

3. ———: ———: Time of Essence of Contract: Waiver. The written agreement of a land company of Scotland gave plaintiff three months to raise thirty thousand dollars of the purchase price of 71,000 acres of Missouri land, and nine months thereafter to pay the balance, and provided that "in the event of financial distress, stringency or panic, the times provided for in this agreement within which any or all of the aforesaid payments are to be made shall be extended for such a reasonable length of time respectively as in the opinion of" the company's attorney-in-fact, "on his honor as an individual, shall be reasonable." Held, that time was of the essence of the contract; and extensions of the time in which to make the first payment of thirty thousand dollars, made from time to time by the attorney-in-fact, in each of which it was expressly stipulated that time was of the essence of the contract, were not such a waiver as gave plaintiff the right to enforce the performance of the contract after the time named in the last extension had expired.

4. ———: ———: ———: ———: **Grace.** Efforts made by the agent to aid plaintiff to carry out the contract and to get extensions cannot be tortured into a waiver of the essential elements of time by his principal.

5. ———: ———: ———: **Failure to Comply.** If there be a day fixed by the agreement for the performance of a condition that goes to its very life, the lapse of that day without its being performed and without an extension of time will be a complete bar to a decree for specific performance.

6. ———: ———: ———: **Conditions for Extension.** Where the contract stipulated a condition on which the time for the performance of the contract might be extended, the absence of the condition and a failure to request an extension on that ground will not excuse a failure to comply with a substantive element of the contract within the time designated.

7. ———: ———: ———: **Abstract of Title.** Where the contract contained no agreement that the vendor was to furnish an abstract of title to the lands, and nothing was said about an abstract until after the last extension had expired, the agreement of the vendor's agent to have an abstract completed was entirely outside the contract and had nothing to do with plaintiff's default, and cannot be considered as an extension of time or a waiver of its lapse.

8. ———: ———: ———: **Conditions of Extension: Agent or Arbiter: Irrevocable Power.** Where the only stipulation for the extension of the time in which plaintiff might make the stipulated payment was that "in the event of financial distress, stringency or panic, the time provided for payment shall be extended for a reasonable time as in the opinion of Judge William A. Vincent, on his honor as an individual, shall be reasonable in the circumstances," and Vincent was not called upon to extend the time for either of those reasons, it is utterly immaterial whether Vincent be regarded as the attorney-in-fact of the defendant, or as arbiter; and it is also immaterial whether his power to extend be considered irrevocable, for its exercise was within his discretion as to what would be reasonable, and he refused to extend.

9. ———: ———: ———: **Estoppel.** Where plaintiff was promptly notified that no more extensions would be made of the time in which to perform the contract of which time was of its essence, plaintiff cannot complain that the defendant's agent knew he was still endeavoring to enlist capitalists in his venture and encouraged him therein.

Appeal from Greene Circuit Court.—*Hon. Jas. T. Neville,* Judge.

REVERSED AND REMANDED (*with directions*).

*T. D. Steele* for appellants.

(1) The contract or escrow agreement sued on in this case being entirely unilateral, with no consideration to support it, is therefore incapable of being specifically enforced. There is no mutuality of right and remedy under its terms. The Scotch Land Company could not compel the plaintiffs to perform, and unless each party to the contract can compel the other to perform, then neither can compel the other to do so. The doctrine of mutuality of right and remedy in both parties is the true and main test in all cases. Neither party is bound unless both are bound. 7 Am. and Eng. Ency. Law (2 Ed.), p. 114; Davis v. Petty, 147 Mo. 374; Waterman on Spec. Perf., sec. 186; Fry on Spec. Perf. (3 Am. Ed.), sec. 92. While it is true that the exercise of jurisdiction by a court of equity to compel specific performance is discretionary and not a matter of absolute right even where the given contract exhibits all the tokens and insignia of mutuality, *a fortiori* is it true as to an option or unilateral contract where the vendor is bound by a cable and the vendee by not so much as a silken thread. Hollman v. Conlon, 143 Mo. 378; Glass v. Rowe, 103 Mo. 539. (2) The plaintiffs based their right to a specific performance in this case upon the alleged ground that Judge Vincent had on February 15, 1906, verbally agreed to extend the time of payment until May 20, 1906. It will be useless to recount the testimony upon that point, but suffice to say that the trial court found that he did not do so. Then suppose that he did verbally agree to extend the time as contended for. Even in that event, if that be true, it would simply amount to a parol modification of a written instrument, which cannot be per-

mitted under well established principles. Generally it is contrary to the rule at common law, that parties to a written agreement coming within the provisions of the Statute of Frauds may not, by mere oral agreement, alter one or more of the terms thereof, and thus make a new contract, resting partly in writing and partly in parol. 29 Am. and Eng. Ency. Law (2 Ed.), pp. 824-5; Warren v. Mfg. Co., 161 Mo. 122; Rucker v. Harrington, 52 Mo. App. 481; Beckman v. Mepham, 97 Mo. App. 161; Newman v. Bank, 70 Mo. App. 135; R. S. 1899, sec. 3418; Norris v. Letchworth, 124 S. W. 559; Henning v. Insurance Co., 47 Mo. 425. (3) Time under the contract in question was material and of the essence. Dunaway v. Day, 163 Mo. 426; Smoke Preventer Co. v. St. Louis, 205 Mo. 240; Cockrell v. Bopp, 106 Mo. App. 555.

*T. L. Montgomery* and *E. P. Mann* for respondents.

(1) The court had jurisdiction of the subject-matter and the parties. R. S. 1899, secs. 575 and 582; Bliss on Code Pleading (1 Ed.), sec. 126; Berry v. Robinson, 9 Mo. 276. (2) The escrow agreement was not unilateral. It was signed by all parties and there was a mutuality of obligation between the parties in interest. Even though an optional contract, it was founded upon a valuable consideration and can be specifically enforced. Ivory v. Murphy, 36 Mo. 534; Mastin v. Grimes, 88 Mo. 478; Smith v. Wilson, 160 Mo. 657; Real Estate Co. v. Spelbrink, 211 Mo. 671; Railroad v. Railroad, 98 Ala. 400; Waterman on Spec. Perf., secs. 169, 179; Warren v. Costello, 109 Mo. 340; In re Ferguson's Estate, 124 Mo. 575. (3) The agreement provided that the defendant Vincent might extend the time of payment. Even though time was of the essence of the contract, it was waived by the the conduct of the parties and by continued negotiations, and the Statute of Frauds does not apply. Pom-

eroy on Spec. Perf. (2 Ed.), secs. 417, 418, 419, 394, 395, 396, 397, 398; 2 Pomeroy's Supplementary Eq. Jur. (3 Ed.), sec. 815; Waterman on Spec. Perf., secs. 480 and 482; Melton v. Smith, 65 Mo. 315; Mastin v. Grimes, 88 Mo. 478; Lucket v. Williams, 31 Mo. 54. (4) The tender was made in money, could have been accepted, and was, therefore, sufficient. The appellant repudiated the contract, and it is apparent that no tender would have been accepted. It is therefore not necessary that any tender should have been made. The offer in the bill to comply with the terms of the contract is sufficient to authorize the decree for plaintiffs. 3 Pomeroy's Eq. Jur. (1 Ed.), note to sec. 1407, p. 453; Deichmann v. Deichmann, 49 Mo. 107; Pomeroy on Spec. Perf. (2 Ed.), sec. 361; Carskaddon v. Kennedy, 40 N. Y. Eq. 259. (5) Defendant Vincent's authority, under the escrow agreement, to extend the time of payment was irrevocable. Appellant did not revoke his general power of attorney, but same was placed of record at the instance of McQuary, on March 26, 1906, a few days before this suit was instituted, and pending all negotiations was in full force and effect and defendant Vincent had authority to act in a three-fold capacity, to-wit: (1) as arbiter under the escrow agreement; (2) under general power of attorney from the land company; (3) as solicitor for the land company. Whatever powers and authority he had could not be controlled or restricted by private instructions. Kilpatrick v. Wiley, 197 Mo. 123; Wood v. Railroad, 39 Fed. 52.

GANTT, J.—This is an appeal from a decree of the circuit court of Greene county in a suit brought by the plaintiffs for specific performances. The Missouri Land Company of Scotland (Limited) is a corporation organized under the laws of Great Britain and is organized to transact business in the State of

Missouri, and owned about 71,000 acres of land in Barry county, Missouri.

The plaintiff James H. McQuary is a citizen and resident of said county, and the Missouri Land & Development Company is a corporation organized under the laws of Arizona, with its principal office in Boston in the State of Massachusetts, and not authorized to do any business in Missouri. The defendant William A. Vincent is a citizen of Chicago, Illinois, and the First Trust & Savings Bank is a corporation organized under the laws of the State of Illinois with its place of business in the city of Chicago. The American Loan & Trust Company of Boston is likewise a foreign corporation and not authorized to transact business in this State. George T. Sidway and C. W. Lehnhard are residents and citizens of Barry county, Missouri.

On the 15th day of May, 1905, the plaintiffs McQuary and the Missouri Land & Development Company, and the Missouri Land Company of Scotland and the First Trust & Savings Bank signed what is known in the record as the escrow agreement, which is the basis of this suit. By that agreement it was provided that there should be forthwith deposited with the First Trust & Savings Bank by the persons hereinafter named the documents hereinafter set forth:

(a) By the Missouri Land Company of Scotland (Limited) a warranty deed dated March 1, 1904, executed by John Coubrough under the power of attorney from said land company dated April 26, 1905, conveying to James H. McQuary certain lands situated in Barry county, Missouri, for the full description of which reference is made to the said deed of conveyance.

(b) By James H. McQuary a warranty deed executed by himself and wife, dated March 1, 1904, conveying to the Missouri Land & Development Company, a corporation, the aforesaid lands.

(c)   By the Missouri Land & Development Company, first, a trust deed, executed by it and dated March 1, 1904, conveying to the American Loan & Trust Company, a corporation of Boston, Massachusetts, the aforesaid lands in trust to secure the payment of five hundred bonds of the par value of one thousand dollars each, and, second, the said five hundred bonds with the interest coupons thereto attached, except the coupons due on or before March 1, 1905.

The Missouri Land Company of Scotland then agreed and guaranteed that it would within thirty days thereafter deliver to the said First Trust & Savings Bank a warranty deed conveying the lands to James H. McQuary to take the place and be in lieu of the deed executed by John Coubrough, and if said deed was not properly executed and delivered to the First Trust & Savings Bank within the thirty days, then the time limited for the deposit of subscriptions and the payment of the money should begin to run from the date of the deposit of said deed.

The second paragraph of the escrow agreement provided that, within three months from the date of the deposit in escrow of the deeds and bonds, there should be a bona fide subscription by persons, firms or corporations financially responsible for the amount of their respective subscriptions, payable   within   four months from the 15th day of May, 1905, with the First Trust & Savings Bank, for enough of the bonds at a price not less that seventy per cent of the par value thereof to net thirty thousand dollars, then the said bank should have the several instruments set forth in paragraphs a, b and c of the first article of the escrow agreement recorded in the Recorder of Deeds' office of Barry county, Missouri, and then to deliver the bonds subscribed for to the several purchasers upon the payment of the money therefor; the said subscriptions for the bonds to be satisfactory to the said First Trust & Savings Bank, which had a right to reject any and all

subscriptions that in its judgment were not made by financially responsible parties. Upon the return of the deeds from the recorder of deeds of Barry county, the said First Trust & Savings Bank of Chicago was directed to deliver them to the respective parties, and then to pay to the Missouri Land Company of Scotland thirty thousand dollars at once, and to hold the remainder of the five hundred bonds or to deliver to any purchaser of said bonds, at a price not less than seven hundred dollars for each one thousand dollar bond, as the same might be agreed upon by the purchaser and the Missouri Land and Development Company, until the sum of $213,109.65 should be realized from the sale thereof, or in the event that enough of said bonds should not have been sold so as to realize the $213,109.65 on or before one year from the date of the deposit in escrow, then to hold the remainder or such part of said bonds as in the meantime had not been sold until one year from the date of the deposit of said deeds.

The third paragraph of the escrow agreement provided that in the event enough of the bonds had not been subscribed for so as to net thirty thousand dollars within three months from the 15th day of May, 1905, then the said First Trust & Savings Bank was directed not to file for record in the office of the recorder of deeds of said Barry county the said deeds of conveyance or any of them, but the said First Trust & Savings Bank was required and directed to deliver to the said Missouri Land Company of Scotland the aforesaid two deeds of conveyance from the said land company to the said James H. McQuary, and the aforesaid deed of conveyance of said lands from the said McQuary and wife to the said Missouri Land & Development Company, and also the deed of conveyance in trust from the said Missouri Land & Development Company, and also the deed of conveyance in trust from the said Missouri Land & Development Company to the Amer-

ican Loan & Trust Company, and also all of the said bonds, which said deeds of conveyance and said bonds and each and every one thereof then and there, *before the said delivery thereof,* should be cancelled by the said First Trust & Savings Bank.

Paragraph four of the said escrow agreement provided that if on or before one year from the date of the deposit of said deeds described in paragraph one of said agreement, the sum of $213,109.65, including the said sum of thirty thousand dollars, had been realized from the sale of any of the said bonds then the said Trust & Savings Bank was authorized and directed to deliver the remainder of said bonds to the said Missouri Land & Development Company of Arizona, and to pay the said Missouri Land Company of Scotland $159,832.24, less the said sum of thirty thousand dollars theretofore paid to the said Missouri Land Company of Scotland as therein provided, and to George T. Sidway of Monett, Missouri, the sum of $45,777.41, and the said First Trust & Savings Bank was directed and authorized to retain the sum of $7500, and to pay such part thereof as was required upon the demand of the said McQuary for the purpose of paying taxes, including interest, penalties and costs thereon, upon the said property, up to and including the year 1905, and to pay the balance thereof to George Sidway, or the said bank was authorized to pay out the said sum of $7500 upon the joint order of said McQuary and the said Sidway, whereupon the said escrow agreement, so far as the said First Trust & Savings Bank was concerned, should then and there be fulfilled and discharged.

In the fifth paragraph of said escrow agreement it was provided that in the event that less than $213,-109.65 had been realized from the sale of said bonds as aforesaid, within the time mentioned aforesaid, then the said First Trust & Savings Bank was authorized and directed to pay to the said Missouri Land Company

of Scotland the sum or sums realized from the sale
of the said bonds in excess of said thirty thousand dol-
lars, and to deliver the remainder of said bonds, to-
gether with all the interest coupons thereto attached,
to the said Missouri Land Company of Scotland, which
said bonds should then and there become the absolute
property of the said Missouri Land Company of Scot-
land as if acquired by purchase, and thereupon the said
escrow agreement so far as the said First Trust & Sav-
ings Bank was concerned should then and there be ful-
filled and discharged.

In the sixth paragraph, it was agreed that the ex-
pense and charges of the said bank in executing the
said trust were to be deducted from the residue of the
proceeds of a sale of said bonds after the said Missouri
Land Company of Scotland had been paid in full, and
in case such residue was not sufficient to pay said ex-
penses then the said Land & Development Company
should be liable therefor. It was also agreed that the
said bank might select and employ suitable agents
about the execution of said trust without becoming lia-
ble for neglect, omission or wrongdoing of such agent
unless caused by the bank's own gross negligence or
willful default.

In paragraph eight it was mutually agreed that
this escrow agreement was entered into as a compro-
mise of all differences and disputes between the par-
ties thereto or of any of them with reference to the
sale of said lands.

Paragraph nine is in these words: "It is further
mutually agreed that in the event of the death of said
James H. McQuary or in the event of financial distress,
stringency or panic the times provided in this agree-
ment within which any or all of the aforesaid subscrip-
tions and payments are to be made shall be extended
for such reasonable length of time respectively as in
the opinion of Judge William A. Vincent, on honor as

an individual, of the city of Chicago, Illinois, shall be reasonable in the circumstances.''

This escrow agreement was duly signed by all the parties in quadruplicate, and the several instruments and documents as therein provided were duly and timely deposited in escrow with the said First Trust & Savings Bank of Chicago, except the five hundred bonds, which were never at any time deposited with the said bank in any manner whatever.

The testimony on the part of the plaintiffs tended to show that during the first three months after the deposits in escrow were made, McQuary attempted to negotiate the sale of the bonds in various ways, but could not find any purchasers, and about the time of the expiration of the ninety days provided for in the escrow agreement Mr. McQuary applied to Judge Vincent to extend the time for the payment of the thirty thousand dollars, and Judge Vincent agreed in writing to an extension until September 25, 1905. Thereafter upon the solicitation and at the request of plaintiff McQuary, Judge Vincent again extended the time in writing from September 25th to October 5, 1905, and like extensions were made from October 18th to November 15, 1905, and from November 21, 1905, to December 15, 1905, and from January 8, 1906, to January 31, 1906. It is conceded and fully established by the evidence that the last extension in writing given by Judge Vincent was made on January 8, 1906, to end on January 31, 1906. Practically all the negotiations for extensions of the time were carried on by letters between Mr. McQuary and Judge Vincent. These letters are set forth in full in the record and on the part of Mr. McQuary they are full of protestations of ability to comply, on his part, with the requirements of the escrow agreement, if only the time which he requested should be granted him, only to be marked in each instance by complete failure on his part to succeed in

raising the money to comply with the escrow agreement.

On the part of the plaintiff it was claimed that while it was true that the last extension in writing expired January 31, 1906, Judge Vincent had verbally on February 15, 1906, further extended the time to May 20, 1906, but the learned circuit court found as a matter of fact that Judge Vincent did not extend the time and did not state to Mr. Hooker, hereinafter mentioned, that he had done so. A careful review of all the evidence, especially the written communication of Mr. McQuary to Judge Vincent after the times when he claims that this extension had been made verbally to May 20th, confirms in our mind the correctness of the findings of the circuit court that Judge Vincent did not in fact make any such extension on the 15th of February, 1906, or at any subsequent time, as the language of Mr. McQuary in his communication with Judge Vincent appears to us to be entirely inconsistent with his claim of such an extension. It is also abundantly established by the testimony in the case that after the expiration of the first ninety days provided for raising the thirty thousand dollars Mr. McQuary never attempted any further to sell or dispose of or negotiate the bonds of the Missouri Land & Development Company provided for in the escrow agreement. This part of the scheme for raising the necessary money to pay for the land was practically abandoned by Mr. McQuary, and from that time on he devoted his time to endeavoring to find a purchaser for the timber and the lands themselves, and in his attempt to interest Mr. Elias and Mr. Hines in the matter, nothing was said in regard to the sale of the bonds. Having failed to get Mr. Elias or Mr. Hines or any of their friends and customers to purchase the lands, it appears that on or about the 12th day of March, 1906, and long after the expiration of the time fixed

for the payment of the money and the delivery of the deeds, the plaintiff, Mr. McQuary, interested his nephew, Mr. Hooker of Carthage, Illinois, in the matter, and on that date McQuary sent the following telegram to Judge Vincent: "Land sold. Will pay thirty thousand dollars as soon as purchaser approved title." In reply to this telegram Judge Vincent wrote the plaintiff McQuary as follows: "This morning I had your telegram reading: 'Land sold. Will pay thirty thousand dollars soon. Purchaser approves title.' Which pleases me very much, and I certainly hope this time you have struck right, because I received Saturday a cablegram from Scotland which will not permit of me doing any more wriggling in your behalf. I must 'walk right up to the Captain's desk and settle.' In order to get a few more days time, I have cabled the substance of your telegram to Scotland, and I am waiting anxiously to hear from you definitely so that I can get the thing in satisfactory shape to do something about it. If you have not already written me please do so by return mail and write me fully, as we must get the matter in shape or it will be taken out of my hands. Yours truly, William A. Vincent."

On March 14th, Mr. McQuary wrote to Judge Vincent from St. Louis: "My Dear Judge:—I was glad to secure your letter, but I did not have any time to write to you before leaving for St. Louis. I have not very much to say further than that the parties have contracted to pay the thirty thousand dollars as soon as their attorney approves the title. The abstract will go into his hands Friday. He has been away from home, but will be home Friday. Do not, of course, know how long it will take, but surely not long. I will write you again when I have more to tell. I leave for Terre Haute, Indiana. Yours very truly, James McQuary."

Thereupon Judge Vincent notified plaintiff Mc-Quary that his option had expired, and that Judge Vin-

cent was liable at any time to be placed in a situation
in which he could not aid him in the matter.   On or
about the 22d of March, Mr. McQuary, with his attor-
ney, Mr. Montgomery, and Mr. Hooker, the nephew of
Mr. McQuary, appeared at Judge Vincent's office in
Chicago, and it was on that occasion that Mr. Hooker
and Mr. Montgomery say that Judge  Vincent  said
that Mr. McQuary had until May 20th to comply with
the contract,  but which Judge Vincent denies, and the
court found as a matter of fact that there was no such
extension, but Judge Vincent did tell these gentlemen
that he would do everything in his power to help Mc-
Quary, but that he had offended his own clients in
Scotland by the persistency with which he urged the
renewals of the option.   After other conferences that
day, Judge Vincent wrote to Mr. George Oliver, the
secretary of the Missouri Land Company of Scotland,
at Edinburg, of the meeting of Mr. Hooker, who repre-
sented the firm of Hooker & Cutler.   He notified Mr.
Oliver that he, Vincent, did not think he had authority
to agree to certain modifications of the contract which
they desired, which were that they wanted all the
papers withdrawn from the First Mortgage & Trust
Company of Chicago, except the deed from the Mis-
souri Land Company of Scotland to McQuary, and
that they proposed to pay thirty thousand dollars in
cash and have the deed then delivered to McQuary,
who should immediately execute to Hooker & Cutler
a deed for one-half of the lands, so that McQuary
would be seized of one-half and Hooker & Cutler of the
other half, the tracts to be selected by them, and Mc-
Quary was to give a mortgage signed by himself and
wife on the half which he had selected payable on or
before eighteen months after the date of the mortgage,
and Hooker & Cutler in the same way to give a mort-
gage on the half selected by them, the thirty thousand
dollars of cash to be divided, so that fifteen thousand
dollars of it should be part payment on the tract going

to McQuary, and fifteen thousand dollars to be credited on the part going to Hooker & Cutler. It will be remembered that under the escrow agreement the whole purchase money was to be paid in twelve months, or nine months after the payment of the thirty thousand dollars. Hooker & Cutler said they would not consider the proposition at all unless the time was extended eighteen months and that they wanted the interest to be five per cent on deferred payments.

Judge Vincent urged upon the Scotch company the making of a new arrangement along the above lines, and requested the power of attorney to enable him to carry it out, but in so doing he called their attention to the trouble which would arise in regard to Mr. Sidway's claim against the company which had been provided for in the escrow agreement. He advised his company that Messrs. Hooker and Cutler wished it understood that their proposition would not hold good unless the transaction was closed up in less than thirty days. This proposition the Scotch company declined on March 28th. Judge Vincent notified Mr. Montgomery of the refusal of his company to make the new agreement with Mr. McQuary and Mr. Cutler.

In April, 1906, after all the extensions had expired and after there had been an absolute failure to sell any of the bonds and deposit the proceeds thereof, or the bonds themselves, and after there had been a failure to obtain any subscriptions for the bonds of the Land & Development Company to the First Trust & Savings Bank, as required by the escrow agreement, it appears that Mr. Lee D. Mathias, an attorney at law of Chicago, was an attorney for Messrs. L. B. and George S. Sidway, the latter being one of the parties in whose favor provision was made in the escrow agreement. He testified he learned in April, 1906, from Judge Vincent that it was probable that the Missouri Land Company would accept a proposition from some parties to purchase the lands involved in the escrow

agreement between McQuary and the Missouri Land Company of Scotland, and thereupon he wrote to Mr. Montgomery, the attorney for McQuary, to come to Chicago and bring thirty thousand dollars with him, or for Mr. McQuary to do so, in order to make a tender which he told him would not be accepted, so as to make a basis for a suit for specific performance, so as to tie up the property, and at the same time he began a suit against the land company to compel them to assign to him certain stock in said company which had been assigned to Mr. Mathias by L. B. Sidway, and he also had George T. Sidway bring a suit in Missouri to compel a transfer of certain stock in said company to him. McQuary and Montgomery went to Chicago on the 19th day of April, 1906. Upon inquiry Mathias found that they had not brought the money, but wanted Mathias to raise the money for the tender. He tried to get it for that purpose from the Trader's National Bank, but they refused to let him have the money for such a purpose, so he went to Mr. Ogilvie and told him they would only want the money for a few minutes; that the tender would be refused; Ogilvie had him call up Judge Vincent and make sure the tender would be refused, and Judge Vincent told Mathias and Ogilvie it would be refused; he went in person to see Judge Vincent to be sure it would be refused, and he told him that it would be and he then requested Judge Vincent to instruct the First Trust & Savings Bank to refuse the tender. He and McQuary then went to see Ogilvie and offered him $50 for the use of money for that purpose, but he demanded one hundred dollars, and they agreed to that. Ogilvie, Mathias and McQuary then went to Judge Vincent's office, Ogilvie taking one check for $25,000 and one for $5000, each certified, and they told Judge Vincent that they had come to make the tender in order to show that they were financially responsible, and that the subscription that McQuary was going to make at the bank

would be a subscription of a person of financial responsibility. Judge Vincent called attention to the checks being payable to Ogilvie and not indorsed. Ogilvie wrote his name on them, and handed them to Judge Vincent, and the latter refused to accept the tender on the ground that the time in which the subscription was to be filed at the bank had expired. Nobody denied at that time that the time had expired. Mr. McQuary did not have the checks in his hands at all. Vincent handed them back to Ogilvie. Ogilvie then demanded his one hundred dollars, and McQuary signed the check, and Ogilvie required Mathias to indorse it. They then went to the First Trust & Savings Bank, and told Mr. Boisot, the trust officer, they had come to tender thirty thousand dollars upon a subscription for some bonds of the Missouri Land & Development Company. While they were there Judge Vincent came in, Mr. Boisot said he would not accept the tender because Judge Vincent had directed him not to do so, because the time had expired in which subscriptions could be filed; but he said he would keep the checks and investigate the matter and do whatever he was legally bound to do, and they said to him they would not let him keep the checks unless he gave them the bonds. He said there were no bonds there; that they had never been deposited there by the Loan & Trust Company of Boston, and they then went out. Mathias says he afterwards remembered he had not filed a written subscription for the bonds, and he went to McQuary's hotel and told him they had not filed a written subscription for the bonds, and Mathias then wrote it out, and they then went to the bank and told the trust officer it was Mr. McQuary's subscription for which the tender had been made previous to that time. Mathias corroborated Judge Vincent as to the fact that no extension was made to May 20, 1906. The testimony of Mr. Ogilvie corroborated Mr. Mathias as to the character of the tender.

The testimony failed to establish that the stringency in the money market, or the troubles of the insurance companies, or the Japanese war, had any effect on the failure of McQuary to comply with the escrow agreement. As to the various extensions granted by Judge Vincent he gave such time as Mr. McQuary stated was necessary from time to time. The proofs do not sustain the statement that Mr. Elias had negotiated a sale of the lands to Mr. Hines. All that Hines ever did was to make a tentative proposition to send a man to look at the lands. It is proper to state that Mr. Hooker testified that in the conference he had with Judge Vincent on the 22d of March, at Chicago, he, Hooker, told Judge Vincent he was going to buy the land and pay for it on the terms that his uncle Mr. McQuary had contracted for, but he would like to ask a favor of him, but his buying the land did not depend upon Judge Vincent accepting the proposition, it was that he would like to have the time extended for three years for the payment of at least one-half of the $189,-000, the balance after the payment of the thirty thousand dollars; that he was ready and willing at any moment to pay him the thirty thousand dollars when Judge Vincent should furnish him an abstract that Mr. Cutler's attorney would approve. Judge Vincent replied he did not think the company would extend the time for the payment of the remainder of the money after the thirty thousand dollars was paid, but he would see what they would do, and said he would guarantee him a year. To which Hooker replied: "Well, that of course is the time given in the escrow agreement, and I of course understand that time is to be given after $30,000 has been paid."

There was evidence tending to show that upon an examination of the title to the lands the plaintiffs claimed that the title to 2500 acres of the land was defective and that 640 acres of the land had been sold

by the Missouri Land Company of Scotland to another party.

This sufficiently indicates the general state of facts developed in the trial.

The circuit court held that time was of the essence of the contract in the nature of restrictions on the rights of McQuary, the plaintiff, but held that under the powers conferred upon Judge Vincent he had authority to extend the time, and that in encouraging McQuary to go ahead after the lapse of the time provided in the escrow agreement he had acted within the scope of his authority and by his action and conduct entitled McQuary to a reasonable time in which to complete the sale and comply with the escrow agreement, and that the time had not expired at the time of the tender to the First Trust & Savings Bank of Chicago. He found that the tender was not made in good faith, but it satisfied him that a tender in good faith would have been unavailing. The court therefore decreed a specific performance of the contract and ordered and directed that the defendant American Loan & Trust Company of Boston deliver to the clerk of the court $40,000 of the bonds of the Missouri Land & Development Company on or before the 10th of April, 1909, and that the plaintiff McQuary deposit with the clerk of the court $30,000 on or before the 10th of April, 1909, and that after the deposit of said money the defendant First Trust & Savings Bank of Chicago should deliver the warranty deed held by it to the recorder of Barry county, Missouri, for record, and directed and ordered that thereafter the money should be forwarded to the First Trust & Savings Bank as under the escrow agreement, and that further proceedings by the parties be under the agreement and be closed within one year from that date, and that the plaintiff pay into the said First Trust & Savings Bank of Chicago by said date the sum of money necessary as the payment for said lands; that in the event

of the failure of the American Loan & Trust Company of Boston or of the First Trust & Savings Bank of Chicago to follow the terms of the decree, the same should be considered as having been done, and the plaintiffs' rights maintained thereby, and in the event of the failure of plaintiff McQuary to deposit the thirty thousand dollars on or before the 10th day of April, 1909, the court would order and direct a strict foreclosure barring all his rights in the property, and appointed Roscoe C. Patterson, Esq., referee to ascertain and determine the amount, values and description of all things pertaining to the title of certain lands alleged in the petition to be of insufficient title and also to ascertain and determine the rights of George T. Sidway under this agreement at the present time and report thereon, but that the action of the referee was not in anywise to affect the decree as to the main features of the case, and either party should have the right to appeal, limiting the appeals in the application therefor to the matters passed upon by the referee. In pursuance of the decree the plaintiff deposited in court with the clerk thirty thousand dollars, and the court appointed the clerk a special custodian of the funds so deposited and required him to give a bond therefor. The court also found that Carl W. Lehnhard had since the trial of the cause become interested in the land and made an order removing him as trustee and appointing William R. Self in his stead, and from this decree the defendant has prosecuted this appeal.

I. It is a trite but true statement of the law of this State that the specific performance of a contract in equity is a matter, not of absolute right, but one of sound discretion in the court, and will be denied in cases where such a decree would be inequitable under all the circumstances. [Veth v. Gierth, 92 Mo. 104; Pomeroy v. Fullerton, 131 Mo. 592.]

A fundamental rule is that where plaintiff has wholly failed to meet the substantial terms of the very

agreement on which he relies, he cannot complain if a court of equity leaves him where he has placed himself. This is a plain rule of fairness that has become a maxim of the law. [Secret Service Co. v. Mfg. Co., 125 Mo. l. c. 156.]

In Holgate v. Eaton, 116 U. S. 40, Mr. Justice MILLER declares the language of Mr. Justice STORY in Taylor v. Longworth, 14 Peters (U. S.) 174, to have become a legal maxim in this class of cases. In that case, the court said: "In the first place, there is no doubt that time may be of the essence of a contract for the sale of property. It may be made so by the express stipulations of the parties, or it may arise by implication from the very nature of the property, or the avowed objects of the seller or the purchaser. And even when time is not thus either expressly or impliedly of the essence of the contract, if the party seeking a specific performance has been guilty of gross laches, or has been inexcusably negligent in performing the contract on his part; or if there has, in the intermediate period, been a material change of circumstances, affecting the rights, interests, or obligations of the parties; in all such cases courts of equity will refuse to decree any specific performance, upon the plain ground that it would be inequitable and unjust."

Granting that the compromise of all previous claims by plaintiff was a sufficient consideration for the option to purchase these lands and that during the time specified, and the legal extensions thereof by Judge Vincent, in pursuance of the power conferred upon him in the escrow agreement, we are clearly of opinion that time was made of the essence of this contract and the circuit court properly so found. It is inconceivable that the owners of these lands were intending by their contract to give plaintiff an unlimited time to speculate upon their lands, when we note the great caution used as to the time given to make the

first payment of thirty thousand dollars, to-wit, three months, and the subsequent stipulations as to the payment of the remainder of the purchase money within one year. And if it be said the time was extended, and the defendant Missouri Land Company of Scotland (Limited) waived the time, the answer is that Judge Vincent expressly stipulated in his extensions that time was of the essence of each extension, and he left nothing to inference or misunderstanding in his letters, in which he was constantly warning plaintiff that his principal was granting the extension with extreme reluctance, and only at his earnest solicitation that it should give plaintiff another chance. We fully agree with the learned circuit court that Judge Vincent did not, either in writing or orally, extend the time for paying the thirty thousand dollars after the extension of January 6, 1906, to expire on January 31, 1906. We have been unable, after a laborious examination of the record, to find that defendant Scotch Land Company or Judge Vincent ever waived the time for the performance of the contract, other than might be inferred from their specific extensions of time, in each of which time was made of the essence of the extension. Nor can Judge Vincent's willingness to aid plaintiff be tortured into a waiver of his principal's right, as found by the circuit court. On the contrary plaintiff was fully and fairly told by Judge Vincent that whatever further concessions might be obtained after the failure of plaintiff to comply with his contract, would be purely a matter of grace and not of right.

Mr. Pomeroy, in 4 Pom. Eq. Jur., sec. 1408, says: "Although time is not ordinarily essential, yet it is, as a general rule, material. In order that a default may not defeat a party's remedy, the delay which occasioned it must be explained and accounted for. The doctrine is fundamental that a party seeking the remedy of specific performance, and also the party

who desires to maintain an objection founded upon the other's laches, must show himself to have been 'ready, desirous, prompt, and eager.'" [Davis v. Petty, 147 Mo. l. c. 386.]

In Hollmann v. Conlon, 143 Mo. 369, this question received careful consideration at the hands of this court, the authorities were carefully reviewed, and the language of the court in Lord Ranelagh v. Melton, 2 Dr. & Sm. 278, was quoted with approval, to the effect that "where there is a contract between the owner of land and another person, that if such person shall do a specific act, then he (the owner) will convey the land to him in fee; the relation of vendor and purchaser does not exist between the parties unless and until the act has been done as specified. The court regards it as the case of a condition on the performance of which the party performing it is entitled to a certain benefit; but in order to obtain such benefit he must perform the condition strictly. Therefore, if there be a day fixed for its performance, the lapse of that day without its being performed prevents him from claiming the benefit. Applying that rule to the present case, if the agreement fixes a day for the payment of the money, then it is clear that if that day is past without the payment, the right to compel a conveyance is lost. . . . 'At the expiration of three months' must mean, not at any time after such expiration, but on the day on which the three months expire."

It is impossible we think to hide that this contract was optional in its nature. There was no mutuality of remedy left to the Missouri Land Company if plaintiff failed or refused to make the payment of thirty thousand dollars within the time stipulated, but if plaintiff elected to make the payment, then the deeds were to be recorded and delivered. The record teems with plaintiff's failures to comply with his part of the contract, and of like failure by his corporate substitute

to do the things stipulated on its part, within the time specified or the extensions so kindly extended to him and it. The failures began by the failure to deposit the five hundred bonds with the conveyances required to be filed. Not only were they not filed, but the circuit court in its decree only required $40,000 of bonds at their par value to be filed, thus making an entirely new contract for the parties. The consequences that might result from leaving the remainder of the bonds in the hands of the Missouri Land & Development Company, or the Trust Company in Boston, should the decree be executed, might be disastrous to defendant's rights in the future. We think that time was the essence of this contract, that plaintiff failed to comply or have the Missouri Land and Development Company or the Boston Loan and Trust Company comply with the substantive and essential requirement of depositing the bonds with the First Trust & Savings Bank forthwith as required by the escrow agreement. The contention that the Boston Loan & Trust Company had the right to hold the bonds until the instrument securing them was placed of record and delivered to it is without any foundation in the agreement, but the contrary is true, the bonds were required to be deposited with the First Trust & Savings Bank with the conveyances forthwith. The fact that the Loan Company should hold the deed after recorded in no way conflicts with the plain requirements as to the custody of the bonds by the bank. Without their deposit it was impossible to carry out the contract. These bonds were to represent the consideration for these lands, and yet the defendant Land Company had no assurance or guaranty that they would be devoted to their only legitimate purpose in the absence of their deposit. The conduct of the plaintiff in regard to this vital stipulation in the agreement was not accounted for on the trial. Plaintiff knew when he went through the rather farcical performance of demanding forty of them from the First Trust & Sav-

ings Bank on April 9, 1906, that the bank had none of said bonds; that he had never deposited them there, and that he had not subscribed for them in good faith, and that he was not financially responsible for a subscription for that amount if they had been there. His testimony shows that he was not such a person financially as his agreement required. The failure to comply with this stipulation is not a technical breach, but went to the very life of the contract of which he seeks a specific performance.

Moreover, the subscription for the forty bonds was never filed until after the tender had played its little part in the comedy, as fully appears by Mr. Mathias's testimony. If Mr. Hooker, who appears to be a substantially responsible man, had desired to make a subscription, he and Mr. McQuary could have seen to it that the bonds were filed with the bank, and then made his subscription for the forty bonds long before the expiration of the time they claimed, to-wit, May 20, 1906, but no such thing was done.

Other contentions are made which require our judgment. It is sought to excuse Mr. McQuary's repeated failures to pay the thirty thousand dollars on the ground that the Russo-Japanese War was being waged and that this affected the money market. Outside of the fact that no such ground for extension was ever urged on Judge Vincent or made the basis of his extensions, the facts in evidence show that there was no stringency in the money market on that ground. On the contrary Japan seemingly had no trouble in obtaining a market in this country for its bonds to the amount of millions. The same may be said in regard to a panic and stringency at that time. We are bound to conclude this insistence is an afterthought. Certain it is that at no time was Judge Vincent requested to grant an extension on either of these grounds, the only ones which, as a matter of right, plaintiff was authorized to invoke.

Another point injected into the cause was that the abstract was not furnished. There was no agreement that defendant, the Scotch Company, was to furnish an abstract. The agreement of Judge Vincent to have Mr. Montgomery complete an abstract was entirely outside of the agreement and had nothing to do with plaintiff's defaults and failures. The abstract was never mentioned until after the last extension had expired and when Mr. Hooker was seeking to get a different agreement. In fact, everything the Scotch Company agreed to do, it did as the contract required.

Much has been said in argument and brief in regard to Judge Vincent's power to extend the time of payment. His authority is expressly delimited in the escrow agreement. The only stipulation for extension of the time provided was that ''in the event of the death of James H. McQuary or in the event of financial distress, stringency or panic, the time provided . . . shall be extended for such a reasonable time as in the opinion of Judge William A. Vincent, on his honor as an individual, shall be reasonable in the circumstances.'' Whether regarded as attorney-in-fact or arbiter, these were the conditions upon which he could grant extensions of time. He was never called upon to extend it for either of these reasons and it is utterly immaterial what other powers he had. After the expiration of the last extension, Mr. McQuary was fully advised that Judge Vincent would no longer assume to extend the time without express authority from his principal, and knew that he must rely upon the kindly offices of Judge Vincent with his principal for any further extensions. They knew his authority and could not avail themselves of any act of his in excess of it. That there were freely accorded all proper extensions, the whole record attests, and it abounds with expressions of gratitude on the part of McQuary for the kindness shown, until he conceived the scheme of having Mr. Hooker take over the agreement or make a

new one and Mr. Mathias suggested the tender. It is said the power conferred upon Judge Vincent was irrevocable. Granting that it was, its exercise was within his discretion as to what would be reasonable, within the four exigencies named in the agreement and neither of them occurred. Moreover, he granted each extension as it was requested until he finally notified McQuary and Mr. Montgomery he could no longer do so without authority from the Scotch Company.

Much stress is laid upon the fact that Judge Vincent knew McQuary was still endeavoring to enlist men of means in the venture and encouraged him to try to raise the funds. A reading of the correspondence will demonstrate that in every instance Mr. McQuary had represented he had capitalists who were ready to take hold of the matter and Judge Vincent was desirous of aiding him if he could, but we are unable to find any element of estoppel in anything done or said by Judge Vincent and certainly nothing by the Scotch Company which had become tired of empty promises, and Mr. McQuary was notified that they would not consent to any more extensions. He cannot complain that their conduct misled him, for he was promptly advised by Judge Vincent of their determination.

After a careful consideration of all the testimony in the case, in the light of the settled principles governing this branch of equity jurisprudence, we are of opinion that plaintiffs have not entitled themselves to the relief prayed, nor for a specific performance of their agreement, for the reason that they have not performed their part of the contract, and did not make the payment of thirty thousand dollars within the time specified, nor within any of the extensions of that time given by Judge Vincent, and that it would be inequitable and unjust to require defendant to submit to the decree of the circuit court after it had fully performed its part of the contract, and after plaintiffs had failed

to make the payments and perform the things they had stipulated to do, as a condition to acquiring the title to said lands, and the decree is therefore reversed and the cause remanded with directions to the circuit court to dismiss the bill at the costs of the plaintiffs.

*Fox, C. J., Valliant, Lamm, Woodson* and *Graves, JJ.,* concur; *Burgess, J.,* not sitting.